**In re Johnny (NMN) TUCKER, Debtor.**

**Bankruptcy No. 98–13861.**

United States Bankruptcy Court,
E.D. Tennessee,
Southern Division.

Feb. 5, 1999.

Kenneth C. Rannick, Chattanooga, TN, for debtor.

Mark D. Hackett, Lawrence, Lawrence & Gerbitz, Chattanooga, TN, for Aegis Finance.

## MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

This chapter 13 case is before the court on an objection by the creditor, Aegis Auto Finance, Inc. ("Aegis"), to confirmation of the debtor's modified plan, a motion by the same creditor for relief from the stay, and an objection by the debtor to the claim filed by that creditor in this case. After a hearing and for the reasons that follow the court will sustain the objection to confirmation. A further hearing will be held on the creditor's motion for relief from stay and the debtor's objection to the creditor's claim.

These matters arise out of a previous chapter 13 case (No. 97–14347) filed by the debtor on July 31, 1997. Aegis was a secured creditor in that case and filed a claim for $20,055.48 which it contended was secured by a 1995 Ford Taurus automobile. This claim was filed on October 21, 1997, about a month after the meeting of the creditors was held on September 17, 1997. No representative

of Aegis attended the meeting of creditors, no objection to confirmation was filed by Aegis, and the plan proposed by the debtor was confirmed the following day on September 18, 1997. The debtor's plan provided that Aegis was to be paid as a secured creditor, but it stated the value of Aegis's security as being $1.00, then proposed to pay that $1.00 at the rate of $450 per month.

Within two months of confirmation, the debtor converted his chapter 13 case to a case under chapter 7. The debtor's trustee, most likely believing that the automobile in question was still fully subject to Aegis's security interest, abandoned the automobile and filed a report stating that the debtor's estate contained no assets over and above his exemptions. No distribution to creditors was made, the debtor received a discharge on February 19, 1998, and the case was closed.

Thereafter, Aegis, believing it still retained a valid security interest, repossessed the automobile. In order to forestall further collection action against this collateral, the debtor has filed a new chapter 13 case. He now takes the position that the automobile in question belongs to him as an unencumbered asset because Aegis's lien was stripped away in the preceding chapter 13. The record shows that the chapter 13 trustee actually paid $1.00 to Aegis according to the plan. In the debtor's view, this act paid the creditor one hundred percent of its allowed secured claim and thus extinguished any lien the creditor may have had. *See, e.g., In re Johnson*, 213 B.R. 552 (Bankr.N.D.Ill.1997) (debtor may obtain release of lien upon payment in full of the secured portion of his debt); *In re Nicewonger*, 192 B.R. 886 (Bankr. N.D.Ohio 1996) (same); *In re Lee*, 156 B.R. 628 (Bankr.D.Minn.1993) (same); *In re Murry–Hudson*, 147 B.R. 960 (Bankr.N.D.Cal. 1992) (same). If the debtor is correct in this regard, it means that the creditor's secured claim has been paid in full and its lien satisfied in the previous chapter 13 case. The conversion of the case to one under chapter 7 would have discharged all of the unsecured portion of the creditor's claim, and the out-

come of this "chapter 20" would be that the debtor obtained an automobile worth approximately $20,000 for the payment of $1.00.

█ The statutory provision relied upon by the debtor to justify this result is 11 U.S.C. § 1327(a) which provides:

> The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not the creditor has objected to, has accepted, or has rejected the plan.

The creditor, however, while admitting the binding effect of a confirmed plan, points out that the plan provision in question was ambiguous and misleading to the creditor in that it proposed to pay $1.00 at the rate of $450 per month, an absurdity if taken literally.[1]

Thus the debtor's plan can be looked at in two ways. First, it can be viewed as proposing that the value of the creditor's secured claim was actually $1.00, because the value of the 1995 Taurus automobile was actually only $1.00. The other part of the proposal—to pay that $1.00 at the rate of $450 per month—would then be viewed as an inexplicable error. The other way to view this plan provision, again looking at it in its entirety, is to see it as a statement by the debtor that he did not know, or had not yet determined, the real value of the creditor's security, although he agreed to pay whatever the secured claim was at the rate of $450 per month until paid in full. Under this reading, the $1.00 proposed value is not taken literally, and the $1.00 is recognized instead as a nominal figure used by the debtor to indicate that the security has *some* value as yet undetermined. This second reading seems the more reasonable because it deals logically with both terms of the debtor's proposal and does not require the assumption that one is an unintelligible mistake.

Indeed, this second view is almost certainly the one intended by the debtor himself, as is shown by his entries in Schedule D to his

---

1. Because our form confirmation order does not specifically value allowed claims but merely adopts the debtor's plan, the confirmation order adds nothing to either side of the argument and cannot be conclusive of it. The court must therefore resort to analysis of the plan in order to determine what effect confirmation had in this case.

proposed plan. Therein, he listed Aegis Consumer Finance as a secured creditor, valued the automobile in question at $19,438, valued the creditor's security at $14,637, and valued the unsecured portion of the creditor's claim at $4,801. On the same schedule, the debtor did not indicate that this claim was disputed in any way. Thus, the $1.00 assigned as value in the plan provision is most reasonably seen as a nominal $1.00 intended to represent *some* value, but not *the* value.

The use of the nominal $1.00 is well understood in legal circles. It is the legal equivalent of the mathematical "x"—it stands for something else and is not intended to be taken literally.

"Nominal" means "being so small, slight, or negligible as scarcely to be entitled to the name: trifling, insignificant." Webster's Third New International Dictionary of the English Language Unabridged (1966), page 1534. "Hence a *nominal payment* is a token payment, bearing no relation to the real value of what is being paid for." The American Heritage Dictionary, Second College Edition (1985), page 845. "Nominal consideration" is "[o]ne bearing no relation to the real value of the contract or article...." Black's Law Dictionary (6th ed.1990), page 307. "The courts, in referring to the term 'nominal,' frequently use it interchangeably with the sum of one dollar or some other piddling amount; but the real yardstick in determining whether the option price is nominal or substantial would appear to hinge on whether that price bears a resemblance to the fair market price of the article." *In re Universal Medical Services, Inc.,* 8 U.C.C. Rep.Serv. 614, 1970 WL 12640 (Bankr.E.D.Pa.1970).

*In re Winston,* 181 B.R. 589, 592 (Bankr. N.D.Ala.1995). Thus, when a nominal value is used, it is understood that it has no relationship to the real value of a thing, and that is precisely the message sent by the debtor in this case.

■ Judge Lundin in his treatise, *Chapter 13 Bankruptcy,* accurately summarizes how a creditor's claims are bifurcated in a jurisdiction like ours where the bifurcation is part of the confirmation process.

Especially with respect to secured claims, to accomplish confirmation the debtor will make *specific* provision in the plan for the treatment of each "allowed" claim. This is necessary because the mathematics of the plan, feasibility of the plan, and determination of the various tests for confirmation of the plan cannot be undertaken unless the plan is reasonably *specific* with respect to the amount of each secured claim, the amount of the proposed payment to each secured claim holder, the interest rate that will be allowed, and so forth. A *specific* plan provision with respect to the treatment of a secured claim holder typically includes the debtor's proposal for how much of the creditor's claim will be treated as a secured claim under the plan. This almost always means a statement in the plan that values the creditor's collateral for purposes of confirmation.

The Bankruptcy rules require that each creditor be given notice that includes a copy of the plan or a summary of the plan. If the noticing is done properly, each secured creditor will have very *precise* information about the debtor's proposed treatment of the creditor's claims through the plan. If the proposed plan says that a creditor will be secured to a specified amount, unsecured for the balance of its claim, and will receive a stated monthly payment with a specified rate of interest, it is certainly a reasonable expectation that confirmation will bind creditors to the values, monthly payments, interest rates, and "allowed" amount of claims specified in the plan.

Keith M. Lundin, *Chapter 13 Bankruptcy,* 6–16 (1994) (footnotes omitted) (emphasis added). As may be seen from the above description, the efficient working of the bifurcation process depends on a certain level of specificity in the debtor's plan provisions. Thus, before a claim can truly be "provided for" in a plan within the meaning of either 11 U.S.C. § 1327(a) or 11 U.S.C. § 1328(a), the debtor must definitively value the secured portion of the claim and propose its satisfaction under the Code. This debtor's plan lacks the necessary specificity because it is facially ambiguous.

When confirmation occurs, "[t]he provisions of a confirmed plan bind the debtor and each creditor...." 11 U.S.C. § 1327(a). As has been shown, however, the instant plan does not contain a provision specific enough to bind the debtor and creditor, and confirming something so facially ambiguous adds nothing to the process, since the plan is merely adopted by the confirmation order. The result of this failure is that the creditor's claim was never really bifurcated under 11 U.S.C. § 506(a), and the confirmation, which was supposed to resolve the issues in the chapter 13 case, actually resolved nothing. At this late date the debtor can still argue that what was confirmed was the notion that the automobile was worth only $1.00. The creditor can still argue that what was confirmed was the debtor's agreement to pay $450 per month on a secured claim valued according to the creditor's proof of claim.

Thus the creditor's claim was not properly bifurcated, and it still is not. Only a "provision" of a confirmed plan can bind the parties under § 1327(a), and this plan, because of its facial ambiguity, does not contain a provision that actually deals with the claim, actually bifurcates it, or actually resolves it according to law. Consequently, the confirmation of this plan cannot have the res judicata effect intended by 11 U.S.C. § 1327(a), because the bifurcation issue was not actually decided (judicata). As has been stated, albeit in another context,

> Similarly, § 1327(a), which states that "[the provisions of a confirmed plan bind the debtor and each creditor ...,]" does not say and certainly does not mean that something that is not a "provision of a confirmed plan"—that is, the precise amount of each creditor's claim is "binding" when it has not yet been determined.

*In re Minick,* 63 B.R. 440, 441 (Bankr. D.Dist.Col.1986).

■ Nor is this unfair in any way to the debtor, for the general rule that ambiguous documents are construed against the drafters applies to debtors in chapter 13 cases.

> [T]he debtor as draftsman of the plan has to pay the price if there is any ambiguity about the meaning of the terms of the plan. This comports with the long-standing rule that ambiguous terms of a document are to be interpreted against the party that drafted them.

*Fawcett v. United States (In re Fawcett),* 758 F.2d 588, 591 (11th Cir.1985). Under this general rule of interpretation, and under the most logical and coherent reading of the plan provision, the debtor proposed that the creditor's security had some value that was payable at the rate of $450 per month.

■ The court emphasizes that it would unhesitatingly hold a creditor to be bound by the provisions of the plan wherein the debtor had assigned a specific but incorrect value to the creditor's security and thus to his allowed secured claim. This is because an incorrect valuation is still a specific valuation. The bifurcation, although arguably wrong, can nevertheless occur and become res judicata under § 1327(a). The court views what happened in this case as distinctly different. It cannot accept—because it is unrealistic to do so—what is obviously a nominal $1.00 as a true attempt to bifurcate a claim because that would make the other part of the provision—to pay $450.00 monthly—an absurdity. Thus, there is no provision in this plan capable of binding the parties with respect to the claim in question because there is no way of knowing what they are bound to. Does the debtor pay $1.00 or $450 per month?

The creditor's claim was filed on October 21, 1997, and shortly thereafter, on November 10, 1997, the debtor converted his chapter 13 case to a case under chapter 7. At that point the creditor's lien had not been stripped. The allowed secured claim had not been paid because it had not been determined. It is undisputed that the creditor's lien was not avoided in the chapter 7 case, and so it results that the creditor still has its lien on the automobile in question. It follows that the creditor does have a claim in this new chapter 13 case, and the court will therefore deny confirmation of the debtor's modified plan because it does not deal with Aegis's claim.

An appropriate order will enter.